**IN RE: Daniel L. JUNK and Christine H. Junk, Debtors.**

**Daniel M. McDermott, Plaintiff,**

**v.**

**Daniel L. Junk, et al., Defendants.**

**Case No. 13–55139**
**Adv. Pro. No. 15–2064**

United States Bankruptcy Court,
S.D. Ohio, Eastern Division.

Signed July 15, 2015

James A. Coutinho, J. Matthew Fisher, Allen, Kuehnle Stovall & Neuman LLP, Columbus, OH, for Debtors.

***MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' JOINT MOTION FOR STAY OF PROCEEDINGS AND EXTENSION OF TIME TO ANSWER THE COMPLAINT***

John E. Hoffman, Jr., United States Bankruptcy Judge

This adversary proceeding is before the Court on the Motion for Stay of Proceedings and Extension of Time to Answer the Complaint and accompanying memorandum in support filed by Daniel L. Junk and Christine H. Junk ("Motion") (Adv. Doc. 5).[1] For the reasons explained below, the Court denies the Motion.

On June 27, 2013 ("Petition Date"), the Junks filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Junks then commenced an adversary proceeding in which they contested the right of CitiMortgage, Inc. ("CitiMortgage") to enforce a $1.2 million note ("Note") and a mortgage ("Mortgage") on real property in South Carolina ("Oldfield property") securing the Note. CitiMortgage requested that the Court grant it relief from the automatic stay so that state

---

1. References to documents filed in the Junks' bankruptcy case, Case No. 13–55139, will be designated as "Doc. ——," and references to documents filed in this adversary proceeding Adversary Proceeding No. 15–2064, will be designated as "Adv. Doc. ——."

court foreclosure litigation relating to the Note and the Mortgage that was pending on the Petition Date could continue as to the Oldfield property only, not as to the Junks personally. CitiMortgage also asked that the Court abstain from hearing the adversary proceeding. The Court granted CitiMortgage relief from stay to permit it to pursue a foreclosure judgment and abstained from hearing the adversary proceeding to the extent it relates to issues to be decided by the South Carolina state courts, including issues bearing on the enforceability of the Note and the Mortgage. *See Junk v. CitiMortgage, Inc. (In re Junk)*, 512 B.R. 584 (Bankr.S.D.Ohio 2014) ("Stay Relief and Abstention Order"). The Junks filed a timely notice of appeal of the Stay Relief and Abstention Order and elected to have the appeal heard by the United States District Court for the Southern District of Ohio ("District Court").

CitiMortgage filed a motion to dismiss or convert the Junks' Chapter 11 case to Chapter 7 ("CitiMortgage Motion") (Doc. 75), and the Court, on its own motion, issued a show cause order directing the Junks to appear and show cause why a Chapter 11 trustee should not be appointed or their case should not be converted to Chapter 7 ("Show Cause Order") (Doc. 122). The Show Cause Order provided the requisite notice that the Court would consider whether to dismiss the case, convert it to Chapter 7 or order the appointment of a Chapter 11 trustee.

Following a hearing on the CitiMortgage Motion and the Show Cause Order ("Hearing"), the Court entered an order on January 13, 2015 converting the Junks' Chapter 11 case to Chapter 7 ("Conversion Order") (Doc. 136). The Court also issued a Corrected and Modified Bench Ruling on (A) Order Directing Daniel Junk and Christine Junk to Appear and Show Cause Why a Chapter 11 Trustee Should Not be Appointed or Their Case Should Not Be Converted to Chapter 7 and (B) CitiMortgage, Inc.'s Motion to Dismiss or Convert ("Corrected Ruling") (Doc. 148). The Court found that, not only had continuing losses resulted in a diminution of the estate, there was no reasonable likelihood of rehabilitation, Corrected Ruling at 5–6; that the Junks failed to make property insurance payments with respect to the Oldfield property, *id.* at 6, to pay postpetition real estate taxes, *id.* at 7, and to make required payments of quarterly fees to the United States Trustee ("UST"), *id*; that the Junks sold property of the estate and obtained postpetition loans without obtaining the requisite Court approval, *id.* at 8–9; and that the Junks exhibited a lack of candor to the Court. *Id.* at 9. In addition, the Court found that the Junks' monthly operating reports contained a number of material misrepresentations regarding property insurance and real estate taxes and that the reports improperly characterized as gross income from salary and wages tens of thousands of dollars they had received as gifts or loans, or from the sale of property of the estate. *See id.* at 10–12. The Junks appealed the Conversion Order to the District Court.

On February 25, 2015, the UST commenced this adversary proceeding by filing a complaint ("Complaint") against the Junks under § 727(a)(4)(A) of the Bankruptcy Code (which provides for the denial of a bankruptcy discharge if "the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account") and served the Complaint and a summons on the Junks that same day. Under Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)"), the deadline for the Junks to answer the complaint was March 27, 2015 (30 days after the issuance of the summons). Fed. R. Bankr.P. 7012(a). Before the March 27 deadline expired, the UST

and the Junks agreed to extend the deadline to April 26, 2015. Adv. Doc. 4. The April 26 deadline, however, came and went without the Junks taking any action to extend it. They did not answer the Complaint by April 26, nor did they file or serve "a motion permitted under [Bankruptcy Rule 7012]" by that date. Fed. R. Bankr.P. 7012(a). Instead, on April 27, 2015—after their time to answer the Complaint had expired—the Junks filed and served the Motion.[2]

■ By the Motion, the Junks request a stay of this adversary proceeding and an extension of their time to answer the Complaint until 30 days after the District Court decides the appeal of the Conversion Order.[3] In seeking an extension of their time to answer the Complaint, the Junks rely on Bankruptcy Rule 9006, under which a request for an enlargement of the time to answer or respond to a complaint made "after the expiration of the specified period" may be granted only "where the failure to act was the result of excusable neglect." Fed. R. Bankr.P. 9006(b)(1). The Junks filed the Motion after their time to answer the Complaint had already expired, yet they make no attempt in the Motion to explain how their failure to act in a timely manner was the result of excusable neglect. The request for an enlargement of the time to answer the Complaint must therefore be denied.

■ The Junks also request a stay of the adversary proceeding pursuant to Bankruptcy Rules 8007(a)(1)(D) and 8007(e). Under Bankruptcy Rule 8007(a)(1)(D), "[o]rdinarily, a party must move first in the bankruptcy court for . . .

the suspension or continuation of proceedings in a case or other relief permitted by subdivision (e)." And Bankruptcy Rule 8007(e)(1) permits a bankruptcy court to "suspend or order the continuation of other proceedings in the case." When analyzing requests to suspend proceedings under Bankruptcy Rule 8007(e)(1), bankruptcy courts "consider four factors that are traditionally considered in determining whether to grant a preliminary injunction." *In re Mich. Produce Haulers, Inc.*, No. 14–03188, 2015 WL 1275387, at *2 (Bankr. W.D.Mich. Mar. 19, 2015). Those factors are:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay, (3) the prospect that others will be harmed if the court grants the stay, and (4) the public interest in granting the stay.

*Id.* (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.1991)). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Griepentrog*, 945 F.2d at 153. After considering these factors below, the Court concludes that it must deny the Junks' request for a stay of this adversary proceeding pending appeal of the Conversion Order and the Stay Relief and Abstention Order.

According to the Sixth Circuit, "a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal." *Id.* In the Motion, the Junks make two arguments in

---

**2.** Although the Junks dated the Motion April 26, 2015, the docket makes clear that they did not file it until April 27, 2015, and the Junks and the UST have signed a stipulation ("Proposed Stipulation and Agreed Order") stating that the Motion was filed on April 27, 2015.

**3.** The District Court has identified the case initiated by the appeal of the Stay Relief and Abstention Order and the case initiated by the appeal of the Conversion Order as related cases that will be heard by the same District Court judge.

support of their contention that the Conversion Order will be reversed by the District Court. Those arguments, however, provide no basis for the Court to conclude that the Junks are likely to succeed in their attempt to obtain the reversal of the Conversion Order.

The Junks first argue that "[a]s a result of the Court's denial of [their] counsel's appearance, [the Junks] . . . were deprived of any meaningful right to be heard by the Court at the *sua sponte* Show Cause Hearing." Mot. at 8. This argument, though, is belied by the facts. As explained below, the Court provided the Junks ample time and opportunity to retain counsel to represent them. On October 20, 2014, the Court held a status conference on the CitiMortgage Motion. Susan Rhiel, who was then the Junks bankruptcy counsel, and who had filed a notice of withdrawal from her representation of the Junks (Doc. 33), stated during the status conference that the Junks had not paid her fees in some time. *See* Transcript of October 20, 2014 Hearing (Doc. 125) at 4. The Court explained that this was not necessarily a reason for the Court to permit withdrawal. *Id.* at 5. Ms. Rhiel then stated that she also believed that, under the applicable rules governing her professional conduct, she could not continue to represent the Junks. *Id.* at 5, 40–41. Jennifer Brunner (special counsel to the Junks in their adversary proceeding against CitiMortgage) denied that there were reasons for Ms. Rhiel's withdrawal other than nonpayment. *Id.* at 6. But the Junks opted not to waive the attorney-client privilege, meaning that Ms. Rhiel was not in a position to provide further explanation. *Id.* at 7. Ms. Brunner stated that the Junks were in the process of seeking counsel to represent them going forward in their Chapter 11 case, *id.* at 15, and the Court authorized Ms. Rhiel's withdrawal. *Id.* at 38. Upon questions posed by the Court, Mr. Junk conceded, directly or through Ms. Brunner, that the Junks had not been insuring their interest in the Oldfield property and had not been paying real estate taxes. *Id.* at 20, 24–25. For this reason and others, the Court stated that it would issue a show cause order as to why a Chapter 11 trustee should not be appointed or why the case should not be dismissed or converted to Chapter 7 and would set a hearing on that order and on the CitiMortgage Motion. *Id.* at 37. On October 23, 2014, the Court issued the Show Cause Order, directing the Junks to appear and show cause why a Chapter 11 trustee should not be appointed or their case should not be converted to Chapter 7 for the reasons detailed in the order.

The Show Cause Order, which was served on the Junks on October 25, 2014 (Doc. 123), set the Hearing for January 9, 2015. Thus, the Junks had 78 days from the issuance of the Show Cause Order and 76 days from the date the order was served to retain counsel to represent them as bankruptcy counsel in their capacities as debtors in possession. They did not do so. Instead, as the Junks note in the Motion, Mot. at 7, Mr. Junk sent an email to the Court on December 29, 2014, stating as follows:

> We write to request a rescheduling or continuance of the January 9, 2015 hearing on CitiMortgage's Motion to Dismiss and this Court's Order to Show Cause re Appointment of a Trustee or Conversion to Chapter 7.

> I have accepted a new job with iControl ESI as a full-time consultant starting January 5, 2015 and confirmed just this morning that I will be in Dallas for training the week of January 5th returning late Thursday night the 8th. I attach a copy of my offer letter indicating my start date of January 5, 2015,

and my airline travel confirmation received this morning for your review.

Additionally, my wife and I are still seeking counsel to represent us at that hearing. I am waiting to hear back from one attorney and am supposed to speak with at least one other attorney yet this week and request more time to obtain counsel and time for counsel to get up to speed on our case. As a result of the holiday week this week and my being in Dallas all next week, there is little if no time for a new attorney to meet with me to discuss the case and the hearing.

I have copied CitiMortgage's counsel on this request but have not conferred with them as to their agreement or disagreement. Because my wife and [I] are currently unrepresented in the main case but represented in the adversary case, CitiMortgage's counsel has expressed that it is not able to communicate with us directly based on its interpretation of the Ohio Code of Ethics. I will file a motion if required but am writing via email first since I do not know whether or not opposing counsel objects as a result of our situation with representation in the main case.

Please let me know if the Court requires my wife and I to file a motion pro se or if it will grant our request to reschedule this hearing as a result of my travel schedule for my new job and allow[ ] us more time to retain new counsel for the main case.

Thank you.

The Court responded by email that same day, stating:

Mr. Junk:

This is in response to the request you made by e-mail to continue the hearing scheduled to commence at 9:30 a.m. on Friday, January 9, 2015 on the motion filed by CitiMortgage, Inc. ("CitiMortgage") to dismiss or convert the Chapter 11 case of Daniel Junk and Christine Junk pursuant to § 1112(b)(1) of the Bankruptcy Code (Doc. 75) and the Order (I) Directing Daniel Junk and Christine Junk to Appear and Show Cause Why a Chapter 11 Trustee Should Not be Appointed or Their Case Should Not Be Converted to Chapter 7, (II) Directing the Junks to Disclose the Sources of Their Bank Deposits and to File Supporting Documents and (III) Establishing Hearing Date of Show Cause Order and on CitiMortgage, Inc.'s Motion to Dismiss or Convert ("Show Cause Order") (Doc. 122).

Absent the agreement of all the parties, the Court does not consider requests for continuances made by email. *See* Current Policies and Procedures (12/11/2013) (available on the Court's website) at 4 ("Matters set before the Court may be continued without a motion if ALL parties are in agreement by sending an email addressed to ALL involved parties. . . . If all the parties do NOT agree to a continuance, the party seeking the continuance must file a motion as soon as practicable prior to the scheduled hearing date. The motion shall set forth the reason the continuance is requested and the reason it is opposed."). In your email, you state that you have not conferred with CitiMortgage regarding the requested continuance. In addition, you do not state whether you have conferred with the Office of the United States Trustee ("UST"), which has filed a witness list (Doc. 131) in response to the Show Cause Order. Accordingly, the Court will not consider your e-mailed request for a continuance.

Furthermore, if you and Mrs. Junk were to file a motion requesting a continuance, the Court would not be inclined to

grant it. You seek a continuance "as a result of my travel schedule for my new job and allowing us more time to retain new counsel for the main case." Yet the Court entered the Show Cause Order more than two months ago (on October 23, 2014), providing you and Mrs. Junk more than ample time to attempt to retain bankruptcy counsel to represent you during the hearing that begins the day after you return from Dallas.

On January 8, 2015—the day before the commencement of the Hearing that had been scheduled more than two months earlier—Allen Kuehnle Stovall & Neuman LLP ("Allen Kuehnle") and Attorneys J. Matthew Fisher and James A. Coutinho filed notices of appearance as counsel on behalf of the Junks as debtors, but not as debtors in possession. Docs. 133 & 134. Because the Junks were still debtors in possession at the time of the Hearing, the Court declined to approve the employment of Allen Kuehnle and Messrs. Fisher and Coutinho as counsel for the Junks in their capacities as debtors but not debtors in possession. The Court explained during the Hearing why it could not approve their employment under 11 U.S.C. § 327 and will not repeat that explanation in this opinion.[4] Suffice it to say here that the Court provided the Junks more than am-

ple time and opportunity to employ counsel to represent them during the Hearing in accordance with the requirements of the Bankruptcy Code.[5] *Cf. In re Colon Martinez*, 472 B.R. 137, 143 (B.A.P. 1st Cir. 2012) ("[C]ontrary to the Debtor's assertion, the record in this case reflects not only that the bankruptcy court directed him to obtain counsel on at least four separate occasions, but also that it afforded him ample time to do so.").

The Junks' second argument for why the Conversion Order should be reversed is that, "because the Court sequestered the parties during testimony and denied Defendants each the opportunity to cross-examine the witnesses, none of the evidence and testimony relied on by the Court in its Order and Modified Bench Ruling is admissible under Fed.R.Evid. 615." Mot. at 8. The Junks did not make this argument during the Hearing; instead, they first asserted it in their statement of issues to be presented on appeal ("Statement of Issues") (Doc. 156).[6] As explained below, the argument that the Court "sequestered the parties during testimony and denied [each of the] Defendants … the opportunity to cross-examine the witnesses" is both factually misleading and legally unavailing.[7]

---

**4.** *See* Transcript of Hearing (Doc. 151) ("Tr") at 3–16. *See also* Order Directing Allen Kuehnle Stovall & Neuman LLP and Attorneys J. Matthew Fisher and James A. Coutinho to Appear and Show Cause Why Retainer Should Not Be Disgorged to the Bankruptcy Estate (Doc. 149).

**5.** Messrs. Fisher and Coutinho remained at counsel table with the Junks and appeared to advise them throughout the Hearing, a fact on which the Court does not rely, but notes for the sake of completeness.

**6.** *See* Statement of Issues at 2 (stating as their third issue on appeal: "Whether the Bankruptcy Court's denial of Joint Appellants' right to be heard through counsel at the *sua*

*sponte* order to show cause hearing where the Judge sequestered the parties during testimony, allowing no opportunity for the Joint Appellants to cross-examine the witnesses, violated Joint Appellants' substantive and procedural due process rights?" and arguing that "[t]he Bankruptcy Court denied Joint Appellants their Constitutional Due Process rights.").

**7.** The Junks appear to assume that the UST would dismiss the Complaint if he were prohibited from supporting it with evidence adduced during the Hearing. Mot. at 10. But even if the UST was unable to use that evidence, this would not prevent him from seeking to elicit evidence at a future trial in

In addressing the Junks' sequestration argument, the Court should first set the record straight. Before Mr. Junk began to testify, the Court asked Mrs. Junk to leave the courtroom, but did not demand that she do so. Tr. at 22 ("I'd ask Mr. Junk to come up and be sworn in, and I'd ask Mrs. Junk to leave the courtroom, because I'm going to have separate questions for you as well. So if you could leave the courtroom while Mr. Junk testifies, I'm going to ask you to do so. There are seats outside available."). Mrs. Junk left the courtroom without objecting to the Court's request. After Mr. Junk answered questions that the Court, counsel for CitiMortgage and counsel for the UST posed to him, he declined the opportunity to make a statement in the way of rebuttal. *Id.* at 84. Mrs. Junk then returned to the courtroom to testify. Before her testimony began, Mr. Junk asked whether he was permitted to remain in the courtroom, and the Court responded that he could do so. *Id.* After Mrs. Junk answered questions from the Court, counsel for CitiMortgage and counsel for the UST, she also declined the opportunity to make a statement in the way of rebuttal. *Id.* at 103. Mr. Junk, who was present during Mrs. Junk's testimony, did not ask to question her. In sum, Mrs. Junk was absent from the courtroom during Mr. Junk's testimony without objection by either of the Junks, Mr. Junk remained in the courtroom the entire time

that Mrs. Junk was testifying but did not ask to question her, and neither of the Junks took the opportunity to provide rebuttal testimony.

In support of their argument that the Conversion Order should be reversed, the Junks rely on Rule 615(a) of the Federal Rules of Evidence, which states in pertinent part that it "does not authorize excluding: (a) a party who is a natural person[.]" Fed.R.Evid. 615(a). But even if a party is excluded in error, there is no likelihood of reversal based on this rule where no prejudice results from the party's exclusion. *See Simone v. Worcester County Inst. for Sav.*, No. 94–1957, 1995 WL 234250, at *5 (1st Cir. Apr. 20, 1995) (holding that a party was not entitled to reversal where there was no "prejudice as a result of [her] exclusion from the courtroom").[8] And the Junks were not prejudiced by Mrs. Junk's absence from the courtroom during her husband's testimony. Here is why. Testifying first, Mr. Junk conceded that he and his wife failed to make property insurance payments with respect to the Oldfield property, Tr. at 78; did not pay postpetition real estate taxes on the property, *id.* at 78; sold personal property despite not having obtained Court approval to do so, *id.* at 37; and failed to pay certain UST quarterly fees. *Id.* at 52. The Junks do not argue that Mr. Junk was mistaken when he testified as to these matters or that Mrs. Junk

support of his allegation that the Junks "knowingly and fraudulently made false oaths in this case when they signed Chapter 11 Monthly Operating Reports under penalty of perjury that contained false and misleading information." Compl. ¶ 10. Nonetheless, the Court has no objection to the UST and the Junks agreeing to hold the Complaint in abeyance pending the appeal of the Conversion Order. The Court, though, has been provided no basis to enter an order that would have the Court find that there is "[g]ood cause," Proposed Stipulation and Agreed Order at 3, to grant a motion for

which there in fact is no legal or factual support and that, as explained below, contains false and seriously misleading statements.

8. *See also United States v. Seschillie,* 310 F.3d 1208, 1214 (9th Cir.2002) (holding that sequestration of essential witness for the defendant—who was exempted from sequestration under Rule 615(c) of the Federal Rules of Evidence—did not warrant reversal where the defendant was not prejudiced).

would have corrected the record if only she had been given the opportunity to question him. How could they? For without having heard her husband testify, Mrs. Junk provided testimony that was consistent with his statements on the points discussed above. *See id.* at 91–92 (failure to make insurance payments), *id.* at 92 (failure to pay postpetition real estate taxes), *id.* at 92–93 (sale of personal property), *id.* at 96 (failure to pay quarterly fees). If the Junks are suggesting that Mr. Junk would have testified falsely if his wife had been able to hear him and that she would then have followed suit, this would hardly support reversal of the Cónversion Order. And any argument they might make that they were somehow prejudiced by not being afforded the opportunity to commit perjury would be unavailing for the additional reason that the Court would have entered the Conversion Order even if they had attempted to tell a consistent but false story. Testimony by a bankruptcy analyst for the UST would have readily established that the Junks were not paying the UST's quarterly fees; one of the Junks' own monthly operating reports revealed some (but not all) of the estate property they had sold without Court approval, *see* Show Cause Order at 10; and, as noted above, Mr. Junk had already conceded during a prior hearing that the Junks had failed to pay insurance premium and real estate taxes with respect to the Oldfield property.

The conduct described above in and of itself provided sufficient cause to convert the Junks' case to Chapter 7. But there were two more reasons to do so, and both of those reasons likewise would have been evident to the Court even if Mrs. Junk had been in the courtroom while her husband testified. First, in statements they made before giving their testimony, the Junks admitted that their net income during the pendency of the case was negative. Tr. at 18, 21. Second, both Junks conceded that their monthly operating reports mischaracterized the nature of certain funds they had received during their Chapter 11 case. During his testimony, Mr. Junk stated that the monthly operating reports improperly characterized loans, gifts and the proceeds of the sale of personal property as gross income from salary and wages, Tr. at 41–47, 57–78, while Mrs. Junk testified generally that she believed the monthly operating reports were accurate. *Id.* at 93. After the testimony, however, the Court took a recess during which the Junks would have had the opportunity to consult with one another. *Id.* at 103. Then, during closing argument, Mr. Junk stated, among other things, that "[w]e reported inaccurately [on the monthly operating reports] but in order to show as much income since we didn't have it, it was put as gross income and I stated I was an independent contractor." *Id.* at 111. "But we weren't trying to hide or lie to the Court about the amount of money that we had, it was just whether it was ... it was just mischaracterized as applied on the reports." *Id.* Mrs. Junk then made statements that were consistent with the foregoing statements of her husband. "I would," she said, "like to emphasize that we did not try to hide any income." *Id.* at 112. She conceded that "it might have been mischaracterized the way that it was reported but we were trying to stay true to the requirements of the [Chapter] 11 and show as much income as possible." *Id.* "So we were putting everything in so that we could show as much income and be positive every month." *Id.*

Rather than providing a basis not to convert the case, this explanation provided a further reason to convert it, for it revealed that the reason the Junks had reported loans, gifts and the proceeds of the sale of personal property as gross income

from salary and wages was to circumvent the consequences of the Court's warning at a status conference conducted earlier in the case, at which "the Court made it very clear to the Junks that it was not going to permit them to languish in Chapter 11 with monthly expenses exceeding their income while they sought to litigate—or in some instances relitigate—claims originally brought in the South Carolina courts." Corrected Ruling at 10–11. The Court accordingly rejected the Junks' attempt to cast a favorable light on the misrepresentations in their monthly operating reports. *See* Corrected Ruling at 10 ("Now I realize that Mrs. Junk stated in her closing remarks that the debtors weren't trying to hide the ball here. She pointed out that the Junks reported all of their income; they simply mischaracterized it. But I take issue with that and don't accept the Junks' spin on the facts. Having considered the testimony today, observed the Junks' demeanor and assessed their credibility, I conclude that they were in fact trying to hide the ball and mislead the Court."). In short, misrepresentations in the monthly operating reports provided an additional reason to convert the Junks' case, and the fact that there were misrepresentations was conceded not only by Mr. Junk during his testimony and closing argument, but also by Mrs. Junk during her closing argument. Once again, no amount of questioning of Mr. Junk by his wife would have negated the effect of those concessions.

In light of all of the foregoing, the result would have been exactly the same—the Conversion Order would have been entered—even if the Court had not asked Mrs. Junk to leave the courtroom during Mr. Junk's testimony; likewise, the result would have been the same even if Messrs. Fisher and Coutinho had represented the Junks during the Hearing. Thus, neither of the Junks was prejudiced by Mrs.

Junk's absence from the courtroom or from their proceeding *pro se*. *See Diaz–Aguilar v. Holder,* 555 Fed.Appx. 545, 547 (6th Cir.2014) ("[I]n order to prevail on a procedural due process claim, prejudice must be demonstrated by showing that the outcome of the proceeding would have been different."); *Rosson v. Fitzgerald (In re Rosson),* 545 F.3d 764, 777 (9th Cir. 2008) ("In short, even after receiving notice of the conversion and having the opportunity to be heard in opposition, Rosson offered nothing to counter the court's finding of bad faith.... Because there is no reason to think that, given appropriate notice and a hearing, Rosson would have said ánything that could have made a difference, Rosson was not prejudiced by any procedural deficiency. We hold that the bankruptcy court did not abuse its discretion in denying the motion to dismiss and converting the case to Chapter 7.") (footnote omitted). As a result, there is very little likelihood that the Conversion Order will be reversed based on the two arguments made by the Junks in the Motion.

██  Although "a movant need not always establish a high probability of success on the merits ... the movant is always required to demonstrate more than the mere possibility of success on the merits" and is "required to show, at a minimum, serious questions going to the merits." *Griepentrog,* 945 F.2d at 153–54 (internal quotation marks omitted). The Junks have demonstrated no serious questions going to the merits of the Conversion Order that would warrant its reversal. Not a single word in the Motion questions the merits of the Court's decision to convert their Chapter 11 case to Chapter 7. In fact, the Junks conceded during the Hearing that cause existed to dismiss their case. Tr. at 18–21. If cause exists to dismiss a case, then cause exists to convert it to Chapter 7, the only question being whether dismissal, conversion

or the appointment of a Chapter 11 trustee is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). And the Court had reason to conclude that conversion was in the best interest of creditors and the estate even before the Junks provided the testimony that they now contend was impermissibly elicited. *See* Show Cause Order at 10 ("[I]t appears to be in the best interests of creditors and the estate to either convert the Junks' case to Chapter 7 or to appoint a Chapter 11 trustee. A trustee would serve as an honest and unbiased party who could 'focus on repaying creditors in the most efficient way and at the least expense possible....' *In re Brutsche*, 476 B.R. 298, 309 (Bankr.D.N.M.2012). In addition, a trustee could investigate the postpetition transfer discussed above [the Junks postpetition sale of jewelry without providing notice and an opportunity for a hearing] and would perform the other duties of a trustee under either § 704 or § 1106 of the Bankruptcy Code.").

Indeed, in the Statement of Issues the Junks do not challenge whether cause existed to convert their case to Chapter 7 or whether conversion was in the best interests of creditors and the estate. For all of the foregoing reasons, the Junks have raised no serious questions as to the merits of the Conversion Order.

It has been said that "if the moving party cannot demonstrate that he is likely to succeed [on the merits] ... the remaining factors become matters of idle curiosity." *Esso Standard Oil Co. v. Monroig–Zayas*, 445 F.3d 13, 18 (1st Cir.2006) (internal quotation marks omitted). This principle holds true here. Having failed to establish a likelihood of success on the merits of their appeal of the Conversion Order, the Junks make other arguments in support of the Motion—relating to irreparable harm, the prospect of harm to other parties and whether a stay of this adversary proceeding would be in the public interest—that are of little or no legal significance. That said, the arguments made by the Junks with regard to the remaining elements of the four-factor test are significant for a different reason: they demonstrate—yet again—the Junks' troubling lack of candor with the Court. In arguing that they will be irreparably harmed absent a stay, the Junks first make misrepresentations related to their purported rescission of the Note and the Mortgage. They state that "[i]f these proceedings are not stayed, Defendants will be forced to continue to seek finality of judgment as to [CitiMortgage's] status as a secured creditor despite this Court's previous finding in [the Stay Relief and Abstention Order] that Defendants exercised their right under TILA to rescind that same transaction which is the source of [its] claimed secured status." Mot. at 10. There are at least two problems with this statement.

First, CitiMortgage's "status as a secured creditor" turns on the enforceability of the Note and the Mortgage, matters that are before the South Carolina state courts as a result of the Stay Relief and Abstention Order. Even if the Stay Relief and Abstention Order were reversed—and the Junks have provided no reason to believe it will be[9]—absent a consensual resolution between CitiMortgage and the Chapter 7 trustee of the Junks' estates, the enforceability of the Note and the Mortgage will continue to be litigated in some court irrespective of whether this

---

**9.** The Court previously denied a motion by the Junks to vacate the Stay Relief and Abstention Order. *See* Opinion and Order on Plaintiffs' Motion to Vacate Memorandum Opinion and Order on (A) Motion of CitiMortgage, Inc. for Relief from the Automatic Stay and (B) Motions for Dismissal of, or Abstention from, Adversary Proceeding (Doc. 330 in Adv. Pro. No. 13–2390).

adversary proceeding is stayed. That is, there is absolutely no relationship between CitiMortgage's status as a secured creditor and the UST's objection to the Junks' receipt of a discharge.

Second, the Junks' representation that the Court made a "previous finding" in the Stay Relief and Abstention Order that they "exercised their right under [the Truth in Lending Act ("TILA"] to rescind th[e] transaction" giving rise to the Note and the Mortgage, Mot. at 10,[10] is simply false. The Court made no such finding. While the Court did find that the Junks sent a notice *purporting* to rescind the Note and the Mortgage, *see* Stay Relief and Abstention Order, 512 B.R. at 589, 592, the Court also found that a South Carolina state court judge (the "Master–in–Equity") dismissed the Junks' rescission claim under TILA with prejudice for three reasons: (1) because the claim was "barred by the applicable statute of limitations[;]" (2) because "the Junks had failed to state a claim for relief [in that] they had 'failed to plead or otherwise allege in the counterclaims that they possessed the ability to tender the loan proceeds as required to maintain a TILA rescission counterclaim' but instead were 'seek[ing] to avoid their mortgage obligation altogether while keeping the house[;]'" and (3) because "the Junks did not exercise the right, if any, to rescind in a timely fashion." *Id.* at 601; *see also id.* at 608 ("[I]n his order dismissing the counterclaims against Citi-Mortgage the Master–in–Equity ruled that the Junks failed to make a timely rescission demand."). It is simply inconceivable that anyone who has read the Stay Relief

and Abstention Order could justifiably conclude that it contained the finding the Junks seek to attribute to the Court.[11]

In arguing that they will be irreparably harmed absent a stay, the Junks also state that they "remain liable for their original purchase money loan amount of at least $843,750.00 to an unknown third-party creditor" and that they "listed the original purchase money loan debt in their Amended Schedule F [Doc. 51] as unsecured." Mot. at 12 & n.3. What they do not say is that they listed the debt as "disputed." Doc. 51. Nor do they explain why they listed the debt as disputed if they "remain liable" for it. In sum, the Junks' statements in the Motion under the heading of "Irreparable Harm" are largely misrepresentations that do nothing to support their position that they will be irreparably harmed absent a stay.

Finally, the Court finds that neither the interest of creditors nor the public interest warrants granting a stay of this adversary proceeding. While the Court has no objection to the UST and the Junks agreeing to hold the Complaint in abeyance pending the appeal of the Conversion Order, *see supra* note 7, the Court believes that granting a motion for which there is no support and one that contains significant misrepresentations would be contrary to the public interest. For all the reasons stated above, the Motion is **DENIED**.

**IT IS SO ORDERED.**

---

**10.** *See also* Mot. at 12–13 (characterizing the Stay Relief and Abstention Order as containing a "finding that Defendants exercised their right of rescission under TILA on March 23, 2009, rendering any security interest [CitiMortgage] may have had void by operation of law under 15 U.S.C. § 1635(b)").

**11.** This is not the first time the Junks have misrepresented an order of this Court. *See* Show Cause Order at 5–6 (explaining why the Junks' "gross mischaracterization" of the Stay Relief and Abstention Order and the dishonesty this and other actions of the Junks exhibited constituted cause for dismissing or converting their case).